**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **FRANK PETERSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02-2552 (RWR)** |
| ) | |
| **ALAN M. HANTMAN,** ) | |
| **Architect of the Capitol,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

---

<u>**MEMORANDUM OPINION**</u>

Plaintiff Frank Peterson sued defendant Alan M. Hantman in his official capacity as Architect of the Capitol ("AOC") for violations of Title VII of the Civil Rights Acts of 1964, as applied to the Office of the AOC by Title IV of the Congressional Accountability Act of 1995, alleging that he was not promoted because of racial discrimination and retaliation and that he was subjected to a hostile work environment.  The defendant denies Peterson's allegations and has moved for summary judgment. Summary judgment will be granted for the defendant on all three claims because Peterson has not rebutted the defendant's legitimate, non-discriminatory reason for not promoting him; he has failed to demonstrate a prima facie case of retaliation; and there is no genuine issue of material fact with respect to the hostile work environment claim and the defendant is entitled to judgment as a matter of law.

2

BACKGROUND

Peterson, a 44-year-old black man, worked for the AOC from 1981 through 1986 and again beginning in 1989.  When he returned in 1989, he worked as a laborer at the WG-4 level.  In 1995, Peterson filed an equal employment opportunity complaint alleging racial discrimination.  As part of the settlement of his complaint, Peterson was transferred to an air conditioning position in another building at the WG-4, step 5, level. Peterson alleges that other similarly-qualified employees were paid at the WG-5 or the WG-8 level.  He claims that he was denied a promotion to the WG-5 level in 1999.

Sometime prior to October 2001, Peterson complained to his supervisor's supervisor, Gregory Simmons, about his lack of job advancement.  Then, in October 2001, Peterson was promoted to the WG-5 level, his current position.  In this position, he is a laborer whose job is to assist more senior laborers and mechanics in various tasks such as plumbing maintenance, electrical maintenance, installation and repair of air-conditioning equipment, and troubleshooting of general malfunctions with the heating/cooling system in the Senate office buildings.  As a WG-5, Peterson is also assigned simple unsupervised tasks such as janitorial duties, manual labor, and clean-up of work sites. Peterson works with a number of other people who are either at his same WG-5 level, at a higher level, or are supervisors.

Those who worked with Peterson in the years leading up to his application for the WG-8 position in November 2001 include Myron Briscoe, a mechanic at the WG-10 level; Mark Weeks, a mechanic at the WG-10 level; Lonnie Ruffin, a laborer at the WG-8 level; and David Whitman, a laborer at the WG-8 level.  Current or former supervisors include Kevin Richmond, assistant supervisor on the night shift; Ronald Marcey, also assistant supervisor on the night shift; Robert Davis, supervisor on the day shift; and Michael Parmer, assistant supervisor in the AOC.

In November 2001, a month after being promoted to the WG-5 position, Peterson applied for a vacant position at the WG-8 level.  He was not selected.  In January 2002, Whitman, a white employee, was selected for the position.  Peterson maintains that he did not know until March 2002 that he had not been selected for the position.  Peterson also states that during the year 2002, an employee he declined to identify used the term "redneck" multiple times in his presence.

Peterson alleges that his supervisors, and Davis in particular, have denied him a promotion because of racial animus and/or retaliation, have withheld training and other advancement opportunities from him, and have permitted racially derogatory comments to be used, creating a hostile work environment. Peterson argues that his training and his work history qualified him for the WG-8 position, but that Davis instead chose Whitman

on grounds of race and in retaliation for Peterson complaining to
Davis' supervisor, Simmons, about Peterson's lack of job
advancement.  Peterson's amended complaint states claims of
racial discrimination, retaliation, and hostile work
environment.[1]  The defendant has moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine
issue as to any material fact and . . . the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ.
P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247 (1986).  All of the evidence in the record is assessed in
evaluating a motion for summary judgment.  See Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  A court "must view the
evidence in the light most favorable to [the non-moving party],
draw all reasonable inferences in [his] favor, and eschew making
credibility determinations or weighing the evidence."  Lathram v.
Snow, 336 F.3d 1085, 1088 (D.C. Cir.) (citing Reeves v. Sanderson

---

[1]  In Peterson's Statement of Claims, the two claims of
racial discrimination and retaliation are referred to as "Claim
I" and "Claim II" respectively.  The hostile work environment is
not designated as "Claim III" but instead is stated in paragraph
24  under "Claim I -- Racial Discrimination."  (Pl.'s Compl. ¶ 24
("The hostile work environment suffered by Mr. Peterson
constitutes racial discrimination and, as such, is a violation of
Title VII of the Civil Rights Act of 1964, as amended").)
Considering that defendant treats this as a separate claim and
giving Peterson the benefit of the ambiguity, the hostile work
environment allegation will be treated as a separate and distinct
claim.

5

Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, it is
clear that the non-moving party is entitled to only reasonable
inferences in his favor.  See Holcomb v. Powell, 433 F.3d 889,
901 (D.C. Cir. 2006).  "The party seeking summary judgment bears
the burden of establishing that no genuine issue of material fact
exists."  Mitchell v. DCX, Inc., 274 F. Supp. 2d 33, 39 (D.D.C.
2003).  A genuine dispute of material fact exists "only 'if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Morgan v. Federal Home Loan Mortgage
Corp., 328 F.3d 647, 650 (D.C. Cir. 2003) (quoting Liberty Lobby,
477 U.S. at 258).

I.   RACIAL DISCRIMINATION CLAIM

     A.   Timeliness of Peterson's claim

     Defendant argues that Peterson's claim is time-barred.  An
employee of the AOC who believes that he has been subjected to
race discrimination or retaliation must request counseling from
the Office of Compliance within 180 days after the alleged
wrongful act.  See 2 U.S.C. § 1402 (2000).  The issue of whether
Peterson's claim is timely has been addressed before, but not
determined conclusively.  (Mem. Op., June 30, 2003 at 5.)  It
remains unclear when Peterson knew or reasonably should have
known that he had not been selected for the WG-8 position.  (See
id.; Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Opp'n") at 19.)  A
white employee, Whitman, was promoted effective January 13, 2002

to the WG-8 position for which Peterson had applied.  In May of
2003, Peterson declared "Mr. Davis told me that he would not
approve my selection for the WG-8 position and that he would not
approve any additional training for me.  I believe that this was
still in March 2002."  (Opp'n Ex. 10, Decl. of Frank Peterson
("Peterson Decl.") at 3, May 13, 2003.)  In his later deposition
in March of 2004, Peterson could say only that he learned of
Whitman's promotion sometime after the beginning of 2002.  He
could not name the particular month.  (Opp'n Ex. 2, Dep. of Frank
Peterson ("Peterson Dep. Day 2") at 47-48, Mar. 30, 2004.)
Defendant argues that Peterson was informed of his non-selection
during the week of January 13, 2002.  (Def.'s Mot. Summ. J.
("Mot.") at 12-14; Mot. Ex. 4, Decl. of Robert Davis ("Davis
Decl.") at 1-2, Mar. 7, 2005; Mot. Ex. 5, Decl. of David Whitman
("Whitman Decl.") at 1-2, Jan. 18, 2005.)

     Viewing the evidence in the light most favorable to Peterson
at this summary judgment stage, the latest Peterson would have
been unaware of his non-selection was March of 2002.  That would
not render Peterson's claim time-barred, as he sought the
required counseling on August 12, 2002, within the six-month time
frame allowed.

B.   <u>Prima facie case of discrimination in promotion</u>

Because Peterson presents no direct evidence that the defendant refused to promote him to the WG-8 position on account of his race, his claim will be analyzed under the familiar framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  <u>See</u> <u>Holcomb</u>, 433 F.3d at 895; <u>Lathram</u>, 336 F.3d at 1088; <u>Morgan</u>, 328 F.3d at 650.  Under this framework, Peterson must first establish a prima facie case of discrimination by showing that: "(1) [he] is a member of a protected class; (2) [he] applied for and was qualified for an available position; (3) despite [his] qualifications, [he] was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." <u>Holcomb</u>, 433 F.3d at 895.  In making a prima facie showing of his qualifications, "a plaintiff need not show that [he] is as qualified as the successful applicant, only that [he] is qualified 'relative to the entire pool from which applications are welcome.'"  <u>Carter v. George Washington Univ.</u>, 387 F.3d 872, 881 (D.C. Cir. 2004) (quoting <u>Mitchell v. Baldridge</u>, 759 F.2d 80, 85 (D.C. Cir. 1985)).  However, "Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates." <u>Fischbach v. D.C. Dep't of Corr.</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  Courts have "consistently declined to serve as a super-

personnel department that reexamines an entity's business decision." Holcomb, 433 F.3d at 897 (internal quotation marks and citation omitted).

"If the plaintiff establishes his prima facie case, the defendant then bears the burden of producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Morgan, 328 F.3d at 651 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)) (internal quotation marks omitted).  "If the defendant produces such evidence, the McDonnell Douglas framework -- with its presumptions and burdens -- disappears, and the sole remaining issue is discrimination vel non." Morgan, 328 F.3d at 651 (citing Reeves, 530 U.S. at 142-43) (internal quotation marks omitted).  While this framework shifts evidentiary burdens between the parties, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143 (internal quotations marks and citation omitted).

Even a prima facie case will not survive in the face of a legitimate, nondiscriminatory explanation for the defendant's conduct.  Therefore, if the defendant has offered a legitimate, nondiscriminatory reason for plaintiff's non-selection, a court need not address whether a defendant has met all the prima facie requirements.  See, e.g., Carter, 387 F.3d at 881; Morgan, 328

F.3d at 653-54.  In order to survive summary judgment, a
plaintiff must "present evidence from which a reasonable fact-
finder could infer that [defendant's] proffered reason for hiring
[the successful applicant] over [plaintiff] was pretextual."
Carter, 387 F.3d at 881.  At a minimum, the "alleged
discriminatee [must] demonstrate at least that his rejection did
not result from the two most common legitimate reasons on which
an employer might rely to reject a job applicant: an absolute or
relative lack of qualifications or the absence of a vacancy in
the job sought."  Int'l Bhd. of Teamsters v. United States, 431
U.S. 324, 358 n.44 (1977).  See also Holcomb, 433 F.3d at 896-97
("[T]o survive summary judgment the plaintiff must show that a
reasonable jury could conclude from all of the evidence that the
adverse employment decision was made for a discriminatory
reason.") (internal quotation marks and citation omitted);
Morgan, 328 F.3d at 654 ("[Plaintiff] bears the burden of showing
that a reasonable jury could conclude that [defendant] failed to
offer him the position out of discriminatory . . . animus.")
(internal quotation marks and citations omitted); Aka v.
Washington Hospital Center, 156 F.3d 1284, 1290 (D.C. Cir. 1998)
("[T]he court must consider all the evidence in its full context
in deciding whether the plaintiff has met his burden of showing
that a reasonable jury could conclude that he had suffered
discrimination . . . .").

There is no dispute as to three of the four McDonnell
Douglas elements of a prima facie case:  Peterson is a member of
a protected class, there was a position open for which Peterson
applied, and the position was filled by a white applicant.  The
parties dispute Peterson's qualifications for the position.  As
evidence of his qualification for promotion from the WG-5
position to the WG-8 position, Peterson submitted records showing
that he completed six job-related technical training courses and
eleven safety training courses in the seven-year period between
his promotion to the WG-5 position in January 1995 and his
application for the WG-8 position in November 2001.  Safety
training courses included "back safety," "bloodborne pathogens"
(2 courses), "asbestos operations and maintenance" (3 courses),
"electrical safety work rules," "confined space awareness/entry,"
"personal protective equipment awareness," "compressed gases,
flammable & combustible liquids and hazard communication," and
"manual lift operator and safety."  Technical courses included
"air conditioning tech - level 1," "hands on industrial
electrical skills workshop for non-electricians," "V-belt and
positive drive belt maintenance seminar," "refrigeration & air
conditioning" (2 courses), and "indoor air quality overview."
(See Opp'n Ex. 6, Apr. 16, 2003.)

The training course records may be some evidence of how
Peterson does (or does not) meet the qualifications for the WG-8

position.  By themselves, however, they do not demonstrate either
that Peterson was more qualified than the successful applicant or
that he was qualified "relative to the entire pool from which
applications are welcome."  Carter, 387 F.3d at 881.

    C.   Defendant's legitimate, nondiscriminatory reason

    Apart from the fact that Peterson has not shown that he was
qualified relative to the entire applicant pool, defendant argues
that Whitman, the applicant selected for the position, was more
qualified than Peterson.  The defendant's evidence suggests a
necessary skill set for the successful WG-8 applicant in this
case that can be broadly divided into three categories:
electrical ability, plumbing ability, and mechanical ability.
The vacancy announcement for the WG-8 position identifies a
variety of critical "knowledge, skills, abilities and other
characteristics ("KSAOs") necessary for successful job
performance."  (Mot. Ex. 14, Vacancy Announcement ("Vacancy
Ann.") at 2.)  These KSAOs include:

> 1. Knowledge of refrigeration[] cycle of a variety of
> commercial and industrial systems to locate and check
> elements.
> 2. Ability to troubleshoot a wide variety of systems.
> 3. Demonstrated skill and ability to install, repair, and
> overhaul air conditioning and refrigeration equipment and
> systems.

(Id.)  The duties of the WG-8 position include "a variety of
tasks relating to the operation and preventive maintenance and

12

repair of the refrigeration, air conditioning and related equipment." (Id. at 1.)  Duties also require the successful applicant to "[m]ake[] preventive maintenance inspections, major overhauls, installations and repairs to exhaust fans, air conditioning and refrigeration equipment and steam operated cooking equipment." (Id.)  Additionally, the applicant will assist in the "installation of refrigeration, air conditioning and exhaust fan equipment, by connecting lines, controls, compressors, evaporators and condensers, steam lines and valves, charging system with proper refrigerants and oils, operating equipment and checking for leaks and proper operation and assuring that desired temperature is reached." (Id.)  The individual must also "[r]eplace[] and install[] such parts as compressor head, valve plates, discharge valves, pistons, pins, rods, sleeves, back and front pressure plates, fans, and pipe covering." (Id. at 1-2.)  To accomplish these many different tasks, the applicant must use "various tools and test equipment (prestolite torch, voltmeter, ammeter, pressure gauges[,] vacuum pumps, and precision measuring instruments)." (Id. at 2.)  None of Peterson's co-workers recommended to Davis that Peterson be promoted to the WG-8 level. (Mot. Ex. 10, Deposition of Robert E. Davis ("Davis Dep.") at 77, July 22, 2004.)

1.  Peterson's electrical ability

During Peterson's deposition, he identified employee Ronald Marcey as the co-worker he would rely upon for a job reference. (Peterson Dep. Day 2 at 35.)  However, Marcey noted that Peterson cannot change a ballast for a fluorescent light fixture.  (Mot. Ex. 8, Dep. of Ronald Marcey ("Marcey Dep.") at 18, July 8, 2004.)  When Marcey attempted to teach Peterson to change the ballast, Peterson could not "comprehend even how to read the [voltage] meter to see if it's hot or not hot, voltage-wise." (Id. at 22.)  According to Marcey, Peterson is "not capable of doing anything electrical" and when asked whether Peterson could change something easier than a fluorescent light ballast such as a 115-volt light switch, Marcey said Peterson "would hurt himself or somebody around him."  (Id. at 21.)  Marcey also noted that a WG-8 employee "has to be able to read a meter [b]ecause electricity is 70, 80% of our job."  (Id. at 65.)

Peterson's supervisor, Davis, recounted that Peterson once attempted to use a meter to read current flowing through an electrical timer while the timer sat unplugged and unattached on a work bench.  (Davis Dep. at 103.)  At this point, Davis says he "knew [Peterson] really didn't have a grasp of that electric meter and what he was trying to do."  (Id.)

Another supervisor, Richmond, recalled an incident where he attempted to teach Peterson to use an electric meter to check an

electrical panel for blown fuses.  (<u>See</u> Mot. Ex. 7, Dep. of Kevin
Richmond ("Richmond Dep.") at 36, July 7, 2004.)  Peterson
"wasn't able to grasp the knowledge to do it."  (<u>Id.</u>)  Richmond
notes that "I asked [Peterson], after I had showed him how to do
that, and he couldn't give me the correct answer, so I trained
him again and tried again, and he still couldn't get it correct,
so I didn't feel like he was capable of doing -- fulfilling the
task."  (<u>Id.</u> at 37.)  Richmond spent twenty to thirty minutes
attempting to teach Peterson the proper technique.  (<u>Id.</u> at 78.)
Richmond had to eventually suspend the lesson because of safety
concerns.  The panel carried 480 volts of electricity and could
kill a person if a test instrument is touched to the wrong part
of the panel.  (<u>See</u> <u>id.</u> at 74.)  When asked how many minutes it
has taken to teach other people the same technique, Richmond
replied, "[l]ess than five."  (<u>Id.</u> at 78.)

    Weeks, a mechanic employed at the WG-10 level at the time of
his 2004 deposition, worked with Peterson on the day shift before
Peterson switched to the night shift.  (<u>See</u> Mot. Ex. 13, Dep. of
Mark Eugene Weeks ("Weeks Dep.") at 6-7, July 7, 2004.)  He
considers himself "good friends" with Peterson and noted that
"[e]verybody likes [Peterson]."  (<u>Id.</u> at 15-16, 24.)  Weeks
attempted to teach Peterson "how to calibrate thermostats, on
room calls calibrating thermostats."  (<u>Id.</u> at 7.)  According to
Weeks, Peterson did "okay" with the thermostats but "anything

other than that, he didn't really retain any of the information."
(Id.)  Weeks attempted "10 times" to teach Peterson the
principles of how the room air conditioning system worked but
concluded that Peterson "just didn't understand the principles of
it.  I tried to explain how everything worked.  It's just -- it
was I couldn't get him to learn, you know, couldn't get him to
understand it."  (Id. at 9.)  Peterson could not explain how a
thermostat controlled the air temperature in a room.  (Davis Dep.
at 65.)

       2.   Peterson's plumbing ability

The WG-8 position required extensive knowledge of proper
plumbing procedures.  (See Vacancy Ann. at 1-2.)  Some WG-8
plumbing work is dangerous, such as replacing hot and chill water
valves under pressure.  (Weeks Dep. at 12; Richmond Dep. at 75-
77.)  Richmond noted that "[Peterson] has to be watched with
anything . . . that's dangerous, unsafe, or can cause any kind of
major damage."  (Id. at 75.)  When comparing Whitman's plumbing
and other abilities to Peterson's, Richmond remarked "you could
teach [Whitman] something, show him one time and he would take
off with it."  (Id. at 77.)

Sloan valves are used to flush toilets and urinals.  (Id.
at 76.)  Richmond noted that Peterson is unable to change Sloan
valves successfully.  (Id.)  This process must be carefully
carried out because Sloan valves are "under pressure, city water

16

pressure, and if [Peterson] doesn't cut that valve off right
before he opens this or does this or, you know, if he doesn't use
the right wrenches," significant damage could occur.  (Id. at 76-
77.)  Marcey also testified that Peterson could not change Sloan
valves.  (Marcey Dep. at 16.)  In contrast, Whitman could
successfully handle "Sloan valve repairs, or air handler things,
changing belts, or, you know, alignments.  Anything, you know,
that we did he seemed to pick up on very well.  He wasn't
somebody you had to teach again and again.  He grasped it and he
used it the next time."  (Richmond Dep. at 77-78.)

     3.  Peterson's mechanical ability

A person at the WG-8 level should be able independently to
tighten belts, snake a drain, and restart a drive motor for an
air handler.  (See Mot. Ex. 9, Dep. of Lonnie Ruffin ("Ruffin
Dep.") at 23-25, July 8, 2004.)  But, Richmond noted that
Peterson could not be taught to successfully restart a motor
drive for an air handler, a task that is not difficult.
(Richmond Dep. at 35-36.)  In contrast, this was a task that
Whitman completed successfully.  (Id. at 77-78.)  When asked to
describe Peterson's mechanical ability, Richmond remarked,
"[h]e's able to do small tasks well, something that doesn't
require a whole lot of mechanical ability."  (Id. at 75.)
According to Weeks, Peterson "wasn't very good with wrenches and
screwdrivers and tools" and that his "hand coordination isn't,

you know, isn't as good as some of the mechanics we had.  He just -- he doesn't turn wrenches very well or screwdrivers."  (<u>Id.</u> at 14.)

Davis stated that Peterson is not proficient at power washing, wet vacuuming, or changing soap filters.  (<u>See</u> Davis Dep. at 69.)  Peterson did not "instinctively know, that this was going to be the next step.  You need to coach him, to say, you know, 'We need to remove these filters,' or 'We need to start vacuuming here,' or 'That hose here[.]'"  (<u>Id.</u>)  Davis also noted that "[t]here are things that Frank [Peterson] does and can do.  But as far as the higher-level tasks, no, he needs to be coached and guided into what to do and what needs to be done next."  (<u>Id.</u> at 70.)  In contrast, Whitman "had the anticipation for what was going to happen next, whether it be a tool or the next sequence of events that was going to happen."  (<u>Id.</u> at 104.)

Myron Briscoe is an AOC employee who worked with Peterson in the past.  (Mot. Ex. 11, Dep. of Myron Briscoe ("Briscoe Dep.") at 9, Oct. 7, 2004.)  Briscoe was employed at the WG-10 level at the time of his deposition.  (<u>Id.</u> at 7.)  He recounted seeing Peterson fall asleep while on top of a 12-foot ladder assisting mechanic Kenny Hodgson working on a fan motor.  (<u>Id.</u> at 10-11.)  Peterson was then asked to come down off the ladder.  (<u>Id.</u> at 11.)  Briscoe also noted that Peterson is a "nice guy and all,

but he's just [not] mechanically inclined, . . . I don't see him doing a whole lot."  (Id. at 18.)

Weeks observed that compared to Peterson, Whitman is "more qualified for the [WG-8] position" and "more mechanically inclined.  He can -- I mean he can go out and do the work by [himself].  That's part of being a Grade 8."  (Weeks Dep. at 11-12.)  Parmer, an assistant supervisor, noted that Whitman was more skilled than Peterson and that Whitman could "[t]ake a motor apart, replace bearings, replace valves, [and] controls" single-handedly while Peterson could not do these things unassisted. (Mot. Ex. 12, Dep. of Michael Glenn Parmer, Sr. ("Parmer Dep.") at 31, Oct. 7, 2004.)  And, referring to Whitman, Richmond stated, "I mean you felt comfortable sending him out.  After a few times of him being with a mechanic, you felt like he -- if he had to he could do that job on his own."  (Richmond Dep. at 78.) In sum, the defendant has presented evidence that Whitman was more qualified for the WG-8 position than Peterson.

D.   Evidence of pretext

Because the defendant has advanced a legitimate, nondiscriminatory reason for denying Peterson the WG-8 position, Peterson does not enjoy the presumption of discrimination.  He can defeat summary judgment on this claim only if he can show that defendant's explanation for its selection is mere pretext for discrimination, or if he can show other evidence that permits

a reasonable inference that the selection was a product of discrimination.

Peterson has not established "that [his] qualifications were sufficiently superior to those of [the successful candidate] to allow a [fact-finder] to infer discrimination." Holcomb, 433 F.3d at 898 (discussing the awarding of summary judgment after defendant offered a legitimate, nondiscriminatory reason). He has offered no independent evidence of discriminatory statements or attitudes by the defendant. Peterson fails to offer any testimony or evidence to rebut the facts to which Weeks, Richmond, Marcey, Davis, Briscoe, and Parmer testified. For example, he presented no evidence that he *did* demonstrate to the defendant that he, Peterson, understood how correctly to read electric meters; that he could explain how a thermostat controlled the air temperature in a room; that he could safely change highly pressurized Sloan valves; or that he was very good with handling wrenches, screwdrivers, and other tools, and had eye-hand coordination as good as that of other applicants. Nor did Peterson present evidence that Whitman *could not* quickly learn skills without repeated coaching; that Whitman *could not* successfully handle Sloan valve repairs; that Whitman *did not* have intuitive abilities with mechanical procedures; or that Whitman *could not* be trusted to perform mechanical repairs properly on his own.

20

Peterson argues that his "satisfactory" performance ratings raise an issue of genuine dispute as to his qualifications for the WG-8 position.  (Opp'n at 18.)  In connection with this argument, Peterson asserts, without offering any supporting evidence, that everyone is the department receives the same "satisfactory" performance ratings.  (Peterson Dep. Day 1 at 90-91.)  However, Peterson has not shown, nor is it evident, that satisfactory performance in one position is evidence that a person is qualified for a different position requiring a higher level of skill and the ability to work independently.  Even if Whitman and Peterson had the same annual performance ratings, it does not rebut the ample evidence defendant has submitted to establish that Whitman's demonstrated superior job-related skills and understanding made Whitman more qualified for the WG-8 position than Peterson.

Peterson also argues that defendant's criticism of his skill level is a post-hoc rationale too dubious to nullify a genuine issue of material fact.  (Opp'n at 18.)  Apart from the fact that Peterson has not identified a genuine issue of material fact, the defendant's explanation that Whitman was more qualified for the WG-8 position than was Peterson cannot be accurately described as a post-hoc rationale in this case.  Rather, it was the defendant's position from the time that Whitman was selected. Further, there is nothing in the record to suggest that the

defendant changed his justification over time.  (Cf. Opp'n at 18,
citing EEOC v. Sears Roebuck and Co., 243 F.3d 846, 852-53 (4th
Cir. 2001).)  Peterson's arguments do not demonstrate that
defendant's explanation is not legitimate and nondiscriminatory,
and Peterson's discrimination claim cannot survive summary
judgment.

II.  RETALIATION CLAIM

     The McDonnell Douglas framework also governs analysis of
unlawful retaliation claims in violation of 42 U.S.C. § 2000e-
3(a).  To establish a prima facie case of unlawful retaliation,
Peterson must show that he: (1) engaged in statutorily protected
activity; (2) his employer took an adverse personnel action
against him; and (3) a causal connection exists between the two.
Carney v. American Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).
"Where, as here, the plaintiff claims that the retaliation took
the form of a failure to hire, the plaintiff must also show: 4)
that he applied for an available job; and 5) that he was
qualified for that position."  Morgan, 328 F.3d at 651.

     Peterson argues that he engaged in "statutorily protected
activity" by informally complaining to then Assistant
Superintendent Gregory Simmons about lack of job advancement.
During his March 2004 deposition, Peterson never said that he
complained to Simmons about racial discrimination but only about
lack of advancement.  (See Peterson Dep. Day 1 at 36.)  Only in

Peterson's declaration, executed nearly a year earlier in May
2003, does Peterson claim he complained of race discrimination to
Simmons.  (Peterson Decl. at 2.)  Simmons claims, however, that
during this informal complaint, Peterson "did not bring up or
mention to me that he believed that discrimination, retaliation,
a hostile work environment, or any other proscribed reasons were
the basis for his promotion problems.  In fact, the subject never
came up in our conversations."  (Mot., Ex. 3, Decl. of Gregory
Simmons at 1, Mar. 3, 2005.)  If Peterson did not complain to
Simmons that his lack of advancement was due to racial
discrimination, then this conversation is not "statutorily
protected activity."  Even if Peterson engaged in statutorily
protected activity in his discussion with Simmons in the late
summer or early fall of 2001, Peterson must still show the
required causal connection between the adverse personnel action
and Peterson's purported statutorily protected activity in order
to establish a prima facie case.

Peterson argues that his non-selection to the WG-8 position
after he had complained about his lack of professional
advancement demonstrates a "temporal proximity . . . often found
sufficient to establish the requisite causal connection for
[retaliation] claims."  (Opp'n at 15 (internal citations and
quotation marks omitted).)  Peterson's best recollection of the
date of the conversation with Simmons is August 2001, "plus or

minus thirty days." (See Peterson Dep. Day 1 at 36-37 (first

stating that it occurred sometime between January and October

2001, and then, when pressed, fixing on August 2001.) Simmons,

on the other hand, thinks the conversation occurred much earlier,

"approximately October 7, 2000." (Simmons Decl. at 1.) Even

assuming that the conversation occurred in August 2001, the fact

that Peterson was promoted two months later, in October 2001, to

the WG-5 position negates any theory that the conversation

resulted in retaliation in the form of non-selection for the WG-8

position in January 2002, five months after the conversation took

place. See Ball v. Tanoue, 133 F. Supp. 2d 84, 91 (D.D.C. 2001)

(finding that a ten-month interval between protected activity and

adverse action does not support causal inference of retaliation

where there was an intervening positive personnel action).[2]

Thus, although Peterson established that his employer took an

adverse personnel action with respect to him in the form of not

selecting him for the WG-8 position in January 2002, he has not

shown a causal link between the adverse personnel action and his

discussion with Simmons some months before. Even if Peterson had

---

[2]  If this conversation really did occur in October 2000, then
even without the intervening promotion for Peterson, the temporal
proximity argument is a very weak one, at best. See Devera v.
Adams, 874 F. Supp. 17, 21 (D.D.C. 1995) (noting that eight-month
interval is not strongly suggestive of causal link, but depending
on circumstances, may be sufficient to establish causal link);
Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C. 1992) (finding
one-year interval too great to infer causation).

shown the causal link, he has failed to undermine defendant's assertion it selected Whitman over Peterson because Whitman was more qualified than Peterson for the WG-8 position.

Peterson has failed to establish a prima facie case of retaliation and has also failed to rebut defendant's legitimate, nondiscriminatory explanation for selecting Whitman over Peterson.  Accordingly, defendant is entitled to summary judgment on this claim.

III. HOSTILE WORK ENVIRONMENT CLAIM

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993) (quoted in Bowdre v. Richardson, 131 F. Supp. 2d 179, 187 (D.D.C. 2001)). A finding of hostile work environment "depends on the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Bowdre, 131 F. Supp. 2d at 187 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  It is not enough to show "simple teasing, offhand comments, and isolated incidents (unless extremely serious)." Clark County School District v. Breeden, 532 U.S. 268, 271 (2001).

25

During his deposition, Peterson was asked for examples of racial remarks.  He responded, "[l]ike for example, when one employee [said] to me, '[h]ow you like working with rednecks?'" (Peterson Dep. Day 2 at 11.)  According to Peterson, the remarks were made more than five times in 2002.  (Id. at 11, 22.) Peterson declined to identify the speaker (id. at 12), and has not offered any witnesses who actually heard the remark made to Peterson.  (See Opp'n at 9.)  Peterson's opposition cites Richmond in connection with the remark.[3]  (Id.)  However, while Richmond says he has "probably heard" the term "redneck" used in the shop before, he "didn't pay much attention to it.  It wasn't directed at anybody I'm sure."  (Richmond Dep. at 41; see also id. at 83 ("I don't think it was directed toward anybody or anything like that, 'cause I would have -- I mean I didn't find offense to it as a reason, you know.").)  Richmond was not sure if Peterson was present at the time of the remark.  (Id. at 41, 83.)  Richmond further noted that no one in the shop other than Peterson has complained of any type of discrimination.  (Opp'n Ex. 8, Richmond Dep. at 41-42.)

Peterson does not explain how this term intimidated, ridiculed, or insulted him.  Without more, the use of the term

---

[3] Peterson's opposition also makes a reference to Weeks in this connection, and cites to the Weeks deposition at 6.  (See Opp'n at 9.)  There is no mention of "redneck" or any other derogatory term in the portion of the Weeks deposition that is cited.

does not establish evidence of discriminatory intimidation,
ridicule or insult directed at Peterson.  Giving Peterson the
benefit of all reasonable inferences, it is not clear that the
comment carried any racially discriminatory connotations intended
to humiliate or intimidate Peterson.  In addition, Peterson
offers no evidence that the "redneck" remarks so infected his
environment that the conditions or terms of his employment were
altered.  There is no evidence that the term was uttered by
Peterson's supervisor[4] or even by a co-worker in Peterson's
section.

Peterson has not shown a work environment that is "permeated
with discriminatory intimidation, ridicule, and insult."  Harris,
510 U.S. at 22.  At the most, he has shown a few "offhand
comments," generally understood to be derogatory of others, that
he has not linked to impermissible discriminatory animus directed

---

[4] This is not without some significance.  In Morgan, the D.C.
Circuit affirmed a summary judgment for defendant even though
plaintiff could point to a blatantly racially degrading e-mail by
a single employee of defendant.  The court considered the fact,
among others, that the plaintiff did not allege that the
offending employee had any role whatsoever in employment
decisions regarding plaintiff.  See Morgan, 328 F.3d at 654-55.
While Morgan involved a discrimination claim and not a hostile
environment claim, Peterson's lack of evidence is still relevant
because the hostile environment analysis examines the "totality
of the circumstances."  Bowdre, 131 F. Supp. 2d at 187; see also
Holcomb, 433 F.3d at 900 (citing Carter v. George Washington
Univ., 387 F.3d at 880) ("In [Carter], we rejected a finding of
discriminatory intent where the plaintiff alleged discriminatory
intent by an official who 'was not a decision-maker' with respect
to the disputed hiring.").

at Peterson.  <u>Clark County School District</u>, 532 U.S. at 271.  The evidence indicates no genuine issue as to any material fact regarding Peterson's hostile environment claim and no reasonable jury could return a verdict for Peterson on this claim.

<u>                                        CONCLUSION                                        </u>

Peterson has not offered evidence sufficient to rebut defendant's legitimate and nondiscriminatory reason for promoting Whitman instead of Peterson.  He also has not made a prima facie showing of a causal connection between Peterson's non-promotion and his statutorily protected activity and his non-promotion. There is no genuine issue of material fact regarding the work environment and defendant has shown that he is entitled to judgment as a matter of law.  Accordingly, summary judgment for the defendant is warranted on all three claims.  A final, appealable order accompanies this memorandum opinion.

SIGNED this 25th day of May, 2006.


                              _____/s/_____
                              RICHARD W. ROBERTS
                              United States District Judge